TOWNS OF CONCORD AND WELLES-
LEY, MASSACHUSETTS, Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

Boston Edison Company, Intervenor.

No. 87–1247.

United States Court of Appeals,
First Circuit.

Heard Oct. 8, 1987.

Decided April 19, 1988.

As Amended April 20 and May 4, 1988.

Woodrow D. Wollesen with whom Charles F. Wheatley, Jr. and Wheatley & Wollesen, Annapolis, Md., were on brief, for petitioners.

Dwight C. Alpern with whom Catherine C. Cook, Gen. Counsel, and Jerome M. Feit, Sol., Washington, D.C., were on brief, for respondent.

Carmen L. Gentile with whom Bruder & Gentile, Washington, D.C., and Wayne R. Frigard, Boston, Mass., were on brief, for intervenor.

Before BREYER and SELYA, Circuit Judges, and BROWN,\* Senior Circuit Judge.

JOHN R. BROWN, Senior Circuit Judge:

This case arises from an effort on the part of the Towns of Concord and Wellesley, Massachusetts (collectively, "the Towns") to alter the electric power service they received from the Boston Edison Company (Edison). Edison made a new rate filing with the Federal Energy Regulatory Commission (FERC, or "Commission") on behalf of itself and the Towns, seeking approval for the change in service sought by the Towns. The Towns opposed that filing before FERC. That filing was, after amendment, accepted by FERC over the Towns' protest, and the Towns then appealed to this court.[1] The Towns contend, as they did before the Commission, that Edison's filing was invalid (i) because it was deficient under the Commission's own regulations and because (ii) it violated the terms of an earlier settlement agreement, which the Towns contend was still in force between themselves and Edison. Finally, the Towns contend (iii) that even if the new rate filing was otherwise valid, the waiver of the usual 60–day notice requirement requested by Edison so that the new rate could take effect as of July 1, 1985 was improperly granted. We reject each of these contentions, and affirm the decision of the Commission in all respects.

### The 1980 Settlement Agreement
### Its Formation and Duration

Prior to 1985, the Towns had been purchasing electric power from Edison under "all-requirements service," meaning that Edison committed itself to supply 100% of the Towns' electric power needs and the Towns committed themselves to take electric power only from Edison. This preexisting relationship between the Towns and Edison was governed by the Federal Power Act[2] and the regulations of the Commission made under that Act but also by the provisions of an agreement between Edison and the Towns (the "1980 Settlement Agreement"), which they entered into in April, 1980 to resolve "all issues between them in [a set of eight cases then pending before FERC]." Boston Edison Co., 11 FERC ¶ 63,035 (1980). The same agreement also settled as between Edison and the Towns two pending District Court cases and six pending appeals to the First Circuit, all arising from the same transac-

---

\* Of the Fifth Circuit, sitting by designation.

**1.** Pursuant to § 313 of the Federal Power Act, codified at 16 U.S.C. § 825*l* (b).

**2.** Codified at 16 U.S.C. § 824 *et seq*.

tions as the eight FERC cases. That Settlement Agreement[3] had been "accepted"[4] by FERC in a letter-order dated June 26, 1980, in Docket No. ER79–216.

Edison mailed a letter[5] to each of the Towns on February 24, 1984, to terminate Article 5.1 of the 1980 Settlement Agreement, as required by the terms of Article 5.1 itself.[6] The Towns made no contemporaneous protest.

### Towns' Purpose to Purchase NYPA Power

Long after termination of the 1980 Settlement Agreement, the Towns sent separate letters to Edison, on June 26 and June 28, 1985. Each town stated that on July 1, 1985, it would no longer purchase all its power requirements from Edison, but rather would purchase a portion of its power requirements from Edison and the remainder from the New York Power Authority (NYPA).[7]

Edison's rate schedules Nos. 47 and 51, then in effect between Edison and the Towns, provided that the rates specified therein were "applicable only to all-requirements service and to partial-requirements service subject to all the conditions set forth in the 1980 Settlement Agreement." Neither the rate schedules nor the 1980

---

**3.** The only portion of the Settlement Agreement in issue in this case is Article 5.1, which provided in pertinent part:

> Article V—Partial Requirements Service
> 5.1 During the five year period commencing March 1, 1980, Edison, at the request of any of the Towns, will make its all-requirements rate, as that rate is in effect from time to time, available to that Town for partial-requirements service during such five year period unless and until the load factor for the partial-requirements service drops below 54% for a twelve-month period. If and when the load factor drops below 54% for any such twelve-month period, notwithstanding the provisions of Article 3.4, Edison may file or, if already filed, apply to that Town a partial-requirements rate that it considers suitable for such service, and the Town will have the full right to contest the lawfulness of any such rate. Nothing in this article restricts the right of Edison to file or apply terms and conditions, as distinct from a rate, that it considers suitable for partial-requirements service or the right of the Towns to contest the lawfulness of any such terms and conditions. *The five year period under this Article 5.1 will be renewed for an additional five years unless within the twelve month period preceding March 1, 1984 any party to the Settlement Agreement gives written notice to the other parties that the provisions of this Article 5.1 are to terminate on March 1, 1985.*
> (emphasis added).

**4.** As described by FERC in Boston Edison Co., 12 FERC ¶ 61,211 (Aug. 29, 1980) at 61,515. The Commission appears to use "acceptance" and "approval" either interchangeably or in a manner such that acceptance always implies approval, and vice-versa. *Cf.* Boston Edison Co., 11 FERC ¶ 63,035 (1980). In any event, the 1980 Settlement Agreement was approved by FERC as well as "accepted" by it. *See* n. 15, *infra.*

**5.** In pertinent part, the text of each of the two letters read:

> I am writing in connection with the 1980 Settlement Agreement between [the Town] and Boston Edison. Article 5.1 of that agreement provides for Partial Requirements Service under certain conditions. Article 5.1 has a term of five years which will be renewed for an additional five years unless a notice of termination is sent by one party to the others. Boston Edison has determined that it wishes to terminate Article 5.1 of the agreement. Accordingly, pursuant to that article, Boston Edison hereby gives notice that the provision of Article 5.1 of the 1980 Settlement Agreement is to terminate on March 1, 1985.

> The letters were signed by Benjamin Weiner, a Vice President of Edison and head of its Energy Supply Organization.

**6.** *See* n. 3, *supra.*

**7.** The substantive provisions of the Concord letter, in their entirety, provided:

> Please be advised that on or about June 18, 1985, the Concord Municipal Light Plant signed an agreement with the Massachusetts Department of Public Utilities to receive hydro power from the Power Authority State of New York (PASNY). This power will be available on July 1, 1985.
> Further, the Light Plant expects to receive the power.

> The substantive provisions of the Wellesley letter, except for those that request information from Edison to Wellesley, provided:

> The Wellesley Municipal Light Plant wants to take the PASNY hydro power and energy that will be available under the Power Purchase Agreement—1985A PASNY Hydro Power, enclosure (1), beginning July 1, 1985. It is understood that the amount for Wellesley will be 1296 KW firm and 275 KW peaking power[.]

> The parties refer to the New York State regulatory body both as NYPA and as PASNY. We will refer to that body only as "NYPA."

Settlement Agreement itself established partial-requirements service for the Towns, however. On the contrary, those rate schedules provided that the Towns would "take or pay for ... *all* of ... [their] requirements of electricity" at the rates specified in those schedules (emphasis added).

The electric power service that Edison provides to the Towns is subject to FERC jurisdiction,[8] and cannot be terminated or revised without FERC approval.[9] In the absence of FERC approval of a change, the all-requirements relationship between Edison and the Towns would have had to be continued without change. Accordingly, on August 22, 1985, acting in response to the Towns' declared intentions to take NYPA power, Edison sent a letter to FERC [10] which Edison "tender[ed] ... as a filing of an interim rate schedule supplement [and] which it ask[ed] become retroactively effective on July 1, 1985, to authorize the Company to provide the NYPA energy credit to the two Towns."

On September 11, 1985 the Towns by motion requested FERC to reject the August 22, 1985 filing. The Towns stated that the filing was "patently deficient and should be rejected ... until a full proper filing is made." Based in part on the Towns' protest, FERC issued an order on October 17, 1985, rejecting the August 22, 1985 filing. Edison then began compiling from various sources the information and data for the "full proper filing" which the Towns had demanded in their protest to the August 22, 1985 filing.

On June 26, 1986, Edison filed with FERC a second letter, describing and documenting more completely the same set of rate schedule changes it had filed on August 22, 1985. Under the scheme for which that filing provided, (i) the Towns would pay to Edison the purchase price of *only* that power which the Towns actually purchased from Edison itself; (ii) the power the Towns purchased from NYPA would be transmitted to them over Edison's power lines, for which service the Towns would pay Edison a transmission fee pursuant to a tariff already in existence; and (iii) the Towns would pay slightly more to Edison per unit of power purchased from Edison because of an "adder," [11] which operated to reflect the fact that the Towns' share of certain fixed costs Edison passes through to its municipality customers would be spread over fewer units of power purchased from Edison by the Towns. Otherwise, the Towns would pay the same price for their power as before: under both the

---

**8.** *See* § 201 of the Federal Power Act, codified at 16 U.S.C. § 824.

**9.** Section 205(d) of the Federal Power Act, codified at 16 U.S.C. § 824d(d).

**10.** In pertinent part, the text of that letter stated:

On July 1, 1985, the Towns of Concord and Wellesley, Massachusetts, who are served under the Company's Rate Schedules Nos. 47 and 51, respectively, became eligible to receive hydroelectric power from the New York Power Authority ("NYPA"). Rate Schedules 47 and 51 specify that they are for all-requirements service.

The company believes that it now has the required data to determine the energy credit which the Towns should receive for the NYPA power. It seems appropriate to reflect that credit in the bills as soon as reasonably possible, and the Company tenders this letter as an interim rate schedule supplement, which it asks to be made retroactively effective to July 1, 1985, to authorize the Company to provide the NYPA energy credit to the two Towns. In developing the credit, the Company plans to eliminate its entire energy charge on the perti-

nent KWH other than the component for spent nuclear fuel disposal cost for the period prior to April 1983. The Company could not have made this filing sixty days before the proposed effective date since it has been informed only recently that the two customers proposed to take the NYPA power. The Company asks for waiver of the regulations to allow this supplement to become effective as of the date specified herein.

The Company regards this filing as an interim filing since it is engaged in the determination of a rate revision to recognize the capacity component of the NYPA power. When that determination is made, the Company will file another rate schedule change to be retroactively effective to July 1, 1985, reflecting the Towns' receipt of both capacity and energy from the Company and NYPA. When the second filing is made, the Company will include a statement showing and explaining the energy credits theretofore given to the two Towns.

**11.** In the amount of .5787 mills per kilowatt-hour for each kilowatt-hour supplied to the Towns by NYPA.

old and new rate schedules the basic rate per month—consisting of the customer charge, the base demand charge, and the energy charge—remained the same for those services provided under both the old and new schedules.[12]

Paradoxically, however, the Towns again by motion requested FERC to reject Edison's filing. The Towns contended that Edison's filing was invalid because (i) it was "indistinguishable" from the previous filing which the Commission had found to be deficient under the Commission's own regulations and because (ii) it violated the terms of the 1980 Settlement Agreement, which the Towns contended was still in force between themselves and Edison. Finally, the Towns contended that (iii) even if the new rate filing was otherwise valid, the waiver of the usual 60–day notice requirement requested by Edison—so that the new rate could take effect as of July 1, 1985—should not be granted.

The Commission rejected each of the Towns' three contentions. The Commission accepted the June 26, 1986 filing, stating in the language used routinely in Commission orders, that it "minimally complies with the Commission's threshold filing requirements and is not patently deficient." The Commission also found that Edison's letter of February 24, 1984 had been effective to terminate Article 5.1 of the 1980 Settlement Agreement, and that good cause existed to waive the notice requirement and to make the new rate effective as of July 1, 1985. This appeal followed.

### Commission Regulations and the June 26, 1986 Filing

■ The Towns argue that the June 26, 1986 filing did not satisfy the "case in chief" and "burden of proof" requirements of the Commission's own regulations, 18 C.F.R. § 35.13(e)(2) and (3).[13] We decline to decide this point, because the Commission order of August 22, 1986 which accepted Edison's June 26, 1986 filing set a public hearing to determine "the justness and reasonableness of Edison's [new] rates." The rates of which the Towns complain may never take effect, if the Commission decides after that hearing that those rates are unjust or unreasonable. No hardship is visited upon the parties by deferring court consideration of this point. Even if we now ruled Edison's June 26, 1986 filing insufficient, Edison's proposal would eventually come before the Commission anyway, whether or not more than one additional amendment was necessary. The question of sufficiency of the June 26, 1986 filing is not yet ripe for review. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, 691 (1967). Obviously we intimate not the slightest, vaguest suggestion as to the sufficiency, adequacy, or validity of the June 26, 1986 filing.

### Termination of Article 5.1 of the 1980 Settlement Agreement

The Towns assert that Edison's letter of February 24, 1984 was ineffective to terminate Article 5.1 of the 1980 Settlement Agreement even though that letter was in all respects proper notice under the terms of Article 5.1 itself. The Towns argue that since a service which is subject to FERC jurisdiction under the Federal Power Act cannot be terminated or revised without

---

12. Respectively, these charges were $2,200 per customer per month, $16.41 per kilowatt of billing demand, and 32.7953 mills per kilowatt-hour for each kilowatt-hour supplied to the Towns by Edison.

13. In the Towns' application for rehearing, they contended merely that "Edison's [new] filing was just as deficient as [its previous filing] rejected by the Commission."

16 U.S.C. § 825*l*(b) provides in pertinent part: "No objection to the order of the Commission shall be considered by [an appropriate United States Court of Appeals] unless such objection shall have been urged before the Commission *in the application for rehearing,* unless there is reasonable ground for failure to do so."

The Towns have not argued that such a reasonable ground exists, but rather contend that the language of its petition for rehearing was adequate to raise the argument that there was a violation of 18 C.F.R. § 35.13(e)(2) and (3).

Because we hold, *infra,* that the underlying question is not yet ripe for decision, we do not reach the threshold question of whether Towns have preserved the point for appeal.

FERC approval,[14] a letter such as that which Edison sent on February 24, 1984 *cannot* terminate Article 5.1 of the 1980 Settlement Agreement. Were it otherwise, they contend, that letter would have precisely that forbidden effect. Such a letter is not itself a "filing," argue the Towns, apparently because it does not bring the imminent termination or revision of a service to the attention of FERC contemporaneously so that FERC may examine and approve or disapprove that termination or revision of service at the time that the change is to go into effect.

■■■ The Towns' argument, however, misses the mark. Though FERC approval is *usually* given at or near the time of the change, it need not be contemporaneous should FERC itself so elect. 16 U.S.C. § 824d(d) requires only that changes be made on at least sixty days' advance notice. Nothing in the Federal Power Act prohibits the Commission from approving changes *more than* sixty days in advance. Moreover, under § 824d(f), automatic adjustment clauses in public utility rate schedules are expressly contemplated. Once the rate schedule is approved, rate adjustments may be made in accordance with the internally-prescribed automatic adjustment clause without further notice to or action by the Commission.

14. *See* n. 9, *supra.*

15. Although the result it attempts to further is the same one that we reach here, FERC in this case also attempts to exploit this distinction between "filings" and other documents that aren't "filings":

> Article 8 of the 1980 settlement provided that only certain settlement provisions had to be *filed* as part of Edison's rate schedules. The June 26, 1980 letter order *approving* the 1980 settlement designated certain additional provisions to be *filed* as part of the rate schedules. However, under both article 8 and the June 26, 1980 order, article 5.1 was excluded from the list of provisions included in Edison's *filed* rates.

FERC brief at 24 (emphasis added).

At no point does FERC contend, however, that Article 5.1 was excluded from that which FERC *approved.* On the contrary, FERC here admits that the 1980 Settlement Agreement incorporating Article 5.1 *was approved* by FERC. Too, at

■ In this instance, as the Towns themselves point out, FERC in its June 26, 1980 order in Docket No. ER79–216 accepted the 1980 Settlement Agreement. That agreement included Article 5.1, and Article 5.1 included the provisions for its own termination without further notice to or action by FERC, by means of a letter like the letter Edison sent. FERC therefore had notice that such a letter might be sent, and approved in advance that mechanism for termination of Article 5.1. Accordingly, the Commission could rightfully conclude that the letter should be given its intended effect to terminate Article 5.1 regardless of whether or not that letter can itself be classified as a "filing." FERC *approval* is the key to compliance with the mandate of the Federal Power Act; the label "filing" is not.[15].

### Waiver of the Notice Requirement

■ Normally, a 60–day advance notice requirement applies before a new filing can go into effect.[16] In this instance, however, the Commission found that Edison had shown good cause for the Commission to waive that requirement, as it is empowered to do under § 824d(d).

■ Concord and Wellesley did not inform Edison of their impending conversion from all-requirements to partial-requirements service until June 26 and June 28,

oral argument, counsel for the Commission elaborated by stating that "[t]he 1980 Settlement which was agreed to by the Towns and Edison ... made it quite clear that only certain provisions of that Settlement [Agreement] had to be filed rate schedules and Article 5.1 ... was clearly excluded from the list of issues to be filed. The Commission then reviewed that settlement and *accepted* the parties' exclusion of Article 5.1 from the rate schedules. Consequently it's clear that, both in the Settlement and the order, this article is not a filed rate schedule and therefore under the Commission's regulations its termination also does not have to be filed." Though the Commission views the significance of Commission approval somewhat differently than we do, the Commission is in basic agreement that FERC *approval* is significant in the determination of whether Article 5.1 was successfully terminated by Edison.

16. Section 205(d) of the Federal Power Act, codified at 16 U.S.C. § 824d(d).

1985—four and two days, respectively, in advance of actually beginning to receive power from NYPA on July 1. Neither letter provided the detailed information necessary for Edison to develop a "full proper filing." [17] Edison was able to obtain that information in spite of the Towns' letters' shortcomings, but only gradually, through the New England Power Pool [18] and through operating experience gained under the new power arrangement with the Towns. Therefore, the necessity for attempting to prescribe formally a new rate having been brought about by the unilateral, although legal action of the Towns on or about June 26, 1986, Edison could not physically have made a full proper filing 60 days in advance of June 26, 1986.

FERC took account of these circumstances, and made the specific finding that Edison's filing was made on a timely basis. [19] Since the occasion for a new filing was the Towns' taking of NYPA power, it was not an abuse of the Commission's discretion for it to give effect to the filing from July 1, 1985—the date on which the Towns first began to take NYPA power.

■ The process of regulatory change may necessarily be somewhat slower than the parties' business decisions, by which they must respond to a rapidly-changing environment and seize fleeting opportunities. We see no unfairness in FERC's allowing the regulatory change to take effect as of the date of the underlying mutually-agreed change in the parties' relations which prompted it. *See City of Girard, Kansas v. F.E.R.C.,* 790 F.2d 919, 925 (D.C. Cir.1986); *cf. Hall v. F.E.R.C.,* 691 F.2d 1184, 1191–92 (5th Cir.1982), *cert. denied,* 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96; *City of Piqua v. F.E.R.C.,* 610 F.2d 950, 954–55 (D.C.Cir.1979).

### The Denouement

The new filing benefitted the Towns. A continuation of Edison all-requirements service to the Towns beyond July 1, 1985, would have required the Towns to continue to pay Edison for all the electric power that the Towns received, whether or not that power was actually purchased from Edison itself. Therefore, in the absence of the filing that Edison made on June 26, 1986, the Towns would legally have been obligated to pay twice for the portion of their power requirements that they received from the NYPA: once to the NYPA itself (because NYPA was the seller of that power) and once to Edison (because of the "take or pay" provisions of the rate schedules Nos. 47 and 51 then in effect).

The new filing benefitted Edison as well. Following the new filing, Edison could effectively charge a slightly higher rate for the smaller amount of power that it continued to supply to the Towns. Too, Edison could seek a new purchaser-outlet for the surplus power that the Towns no longer purchased from it. If Edison found such a new purchaser-outlet, then Edison's total revenue would increase.

In sum, FERC determined that Edison did not act contrary to law, and the Towns were not wronged as they appear to believe they were. The Commission's decision meets the demands of the law, and we uphold it.

AFFIRMED.

---

**17.** *See* n. 7, *supra.*

**18.** Power pools are organizations whose membership consists of electric utilities in a limited geographic area, designed to foster voluntary coordination among the component utilities to obtain economical utilization of their facilities and resources. *See* § 205 of the Public Utility Regulatory Policies Act of 1978, codified at 16 U.S.C. § 824a–1.

**19.** *See* 38 FERC ¶ 61,112, n. 8.