# United States Court of Appeals
## For the First Circuit

No. 99-2155

TOWN OF NORWOOD, MASSACHUSETTS,

Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent.
_____

NEW ENGLAND POWER COMPANY,

Intervenor.

ON PETITION FOR REVIEW OF AN ORDER OF

THE FEDERAL ENERGY REGULATORY COMMISSION

Before

Boudin, Stahl and Lipez,

<u>Circuit Judges</u>.

Charles F. Wheatley, Jr. with whom Wheatley & Ranquist, Kenneth M. Barna, Alan K. Posner and Rubin & Rudman were on brief for petitioner.

Larry D. Gasteiger with whom Douglas W. Smith, General Counsel, and John H. Conway, Acting Solicitor, were on brief for respondent.

Edward Berlin with whom Robert V. Zener, Swidler Berlin Sheref Friedman, LLP and John F. Sherman, III, Associate General Counsel, The New England Electric System Companies, were on brief for intervenor.

June 29, 2000

BOUDIN, <u>Circuit Judge</u>.  In this case, the Town of Norwood, Massachusetts, seeks review of orders of the Federal Energy Regulatory Commission ("FERC") denying Norwood's petition for declaratory rulings.  The case is a sequel to <u>Town of Norwood</u> v. <u>FERC</u>, 202 F.3d 392 (1st Cir.), <u>petition for cert. filed</u> (U.S. May 30, 2000) (No. 99-1914) ("<u>Norwood I</u>"), in which this court sustained related FERC orders.  <u>See also</u> <u>Town of Norwood</u> v. <u>New England Power Co.</u>, 202 F.3d 408 (1st Cir.), <u>petition for cert. filed</u> (U.S. May 30, 2000) (No. 99-1913) ("<u>Norwood II</u>").  The pertinent facts, for which detailed background can be found in <u>Norwood I</u> and <u>II</u>, are as follows.

For many years, New England Power Company was a major integrated electric utility in New England:  it generated power, distributed it as a wholesaler to affiliates and non-affiliates alike, and retailed power through its local affiliates such as Massachusetts Electric Company.  Norwood, which operates a municipal electric company that distributes retail power to residents and businesses in the town, was a long-time purchaser of power from Boston Edison Company, but in 1983 Norwood began to purchase power instead from New England Power.

This opportunity to switch power suppliers was secured after Norwood settled an antitrust case against Boston Edison and New England Power.  See Norwood II, 202 F.3d at 412.  The settlement agreement obligated New England Power to furnish, and Norwood to accept, sufficient power to satisfy Norwood's requirements for electricity through October 31, 1998.  The power was to be supplied pursuant to New England Power's FERC Tariff No. 1--the same wholesale tariff under which New England Power then supplied electricity to its own retail affiliates-- "as [it] may be amended from time to time."  Id.

The requirements contract provided that its term was from November 1, 1983, to October 31, 1998, but it also stated that "[n]either [New England Power] nor Norwood will give notice of termination prior to November 1, 1991 and shall not specify a termination date prior to November 1, 1998."  New England Power's FERC Tariff No. 1, incorporated by reference in its power contract with Norwood, said that "[o]nce initiated, service under this tariff shall continue until terminated by either party giving to the other at least seven years' written notice of termination. . . ."

Thereafter, the parties twice amended the requirements contract.  First, in 1987 the contract was amended to permit Norwood to take advantage of allocations of lower-cost power

-3-

from the New York Power Authority. Second, in 1989 the parties amended the contract to permit Norwood at its election to extend the earliest date on which notice of termination could be given from November 1, 1991, to November 1, 2001.

On July 25, 1990, Norwood sent a letter to New England Power stating that Norwood "hereby gives notice . . . that it extends the date" for giving notice of termination from November 1, 1991, to November 1, 2001. The letter continued: "The effect of this is that the Power Contract between [New England Power] and Norwood would be extended for [ten] years to midnight, October 31, 2008 . . . ." Whether Norwood did intend to extend the contract and whether the extension was effective are principal issues in this case.

Beginning in December 1996, New England Power made a set of regulatory filings to restructure itself and to revise its existing tariff for wholesale power sales. These filings, described in detail and upheld in <u>Norwood I</u>, aimed to secure FERC approval for the sale of New England Power's non-nuclear generating facilities, the release (on payment of termination charges) of affiliates from their long-term requirements contracts with New England Power, and the restructuring of New England Power's wholesale rates to facilitate customer choice

and market-based pricing at both the wholesale and retail levels.  Norwood I, 202 F.3d at 396-97.

In a set of orders issued between November 1997 and June 1998, FERC approved the sale, early termination by affiliates on payment of termination charges, the restructuring of wholesale rates, and a "rate freeze" on New England Power's existing charges with wholesale contract purchasers like Norwood.  This freeze was instituted because under the existing contracts, rates were normally adjusted to reflect increased costs, and New England Power was now divesting itself of its low-cost non-nuclear plants.  Norwood II, 202 F.3d at 413.

Norwood concluded that under the new regime it would be disadvantaged vis-à-vis New England Power's retail affiliates whom Norwood regards as retail competitors.  See Norwood II, 202 F.3d at 414.  On March 4, 1998, Norwood notified New England Power that it was switching to a new wholesale supplier, Northeast Utilities.  Two weeks later, on March 18, 1998, New England Power filed a revised FERC Tariff No. 1 permitting dissident wholesale customers like Norwood to terminate their contracts early and on only thirty days' notice, conditioned on the customers paying a contract termination charge based on an

avoided cost theory.[1]  New England Power Co., 83 F.E.R.C. ¶ 61,174, reh'g denied, 84 F.E.R.C. ¶ 61,175 (1998).

To counter New England Power's March 18, 1998, tariff filing, Norwood not only objected to the charge before FERC, see Norwood I, 202 F.3d at 398, but also, in an effort to shorten the period of liability, Norwood petitioned FERC in April 1999 for a declaratory order, 18 C.F.R. § 385.207 (1999), that its contract with New England Power had terminated on October 31, 1998, and that New England Power therefore had no basis for claiming any contract termination charges after that date. Norwood estimates that if fully allowed, the charges will exceed $7 million per year until 2008.

FERC dismissed Norwood's petition on the merits on June 21, 1999, Town of Norwood, 87 F.E.R.C. ¶ 61,341 (1999).  In a nutshell, the Commission found that Norwood had extended the contract through October 31, 2008, by its July 25, 1990, letter; and it concluded that New England Power's failure to file that letter with FERC was irrelevant.  On August 20, 1999, FERC denied without opinion Norwood's motion for rehearing, and

_____

[1]The contract termination charge is computed as the revenues that New England Power would have expected to collect had the customer continued to pay at the now frozen tariff rate through the earliest date that the customer could have unilaterally terminated service under the contract, less the expected costs avoided by New England Power because it did not have to provide the power.

Norwood has sought review in this court to challenge the Commission's orders, 16 U.S.C. § 825l(b).

Norwood's arguments on appeal, which we address in a sequence somewhat different from Norwood's brief, are in substance five: (1) that the requirements contract with New England Power was never extended beyond October 31, 1998; (2) that any extension premised on the July 25, 1990, letter is ineffective because the letter was not filed with FERC and because reliance upon it violates the so-called filed rate doctrine; (3) that the FERC order unilaterally altered the contract in disregard of the Mobile-Sierra doctrine; (4) that the failure to file the letter prevents FERC from relying on it in construing the contract; and (5) that FERC committed procedural error.

Assuming arguendo that the July 25, 1990, letter was rightly considered, it is clear to us that FERC properly construed the contract to extend Norwood's obligation to take its requirements from New England Power until October 31, 2008. The standard of review need not be considered because, even if review of the contract interpretation question were de novo, our reading would still be precisely that of the Commission. Cf. Boston Edison Co. v. FERC, 856 F.2d 361, 363-64 (1st Cir. 1988). The documents may be inartfully drafted, but taken together,

they make clear that Norwood's contract interpretation argument is hopeless.

It is arguable that even without the July 25, 1990, letter, the proper reading of the original 1983 contract made it self-extending absent notice of termination.[2]  However, there is no reason to decide how matters would stand if there had been no 1989 amendment and letter.  Norwood's July 25, 1990, letter triggered a provision in the 1989 amendment to the original 1983 contract and when both the amendment and the letter are considered, it is crystal clear that--subject to any other possible legal barrier--Norwood's obligation was extended through October 31, 2008.

The 1989 amendment explicitly replaced the article of the 1983 agreement specifying the term of the contract with a new article which specified that the contract continued through midnight, October 31, 1998, except:  (1) neither side could give notice of termination prior to November 1, 1991, or specify a termination date prior to November 1, 1998; and (2):

> Norwood may elect to extend the earliest
> date by which either party can give notice
> of intent to terminate service by a total of

---

[2]The original contract said that its term was through October 31, 1998, but FERC Tariff No. 1. said that seven years' notice is required to terminate; while the contract has an overrule provision, it is not clear that the two terms are inconsistent.

> [twenty] years in two ten-year increments.
> In order to exercise this election, Norwood
> agrees to provide [New England Power] with
> written notice of each such election at
> least one year prior to the date that it is
> to be extended, viz, to November 1, 2001
> initially and to November 1, 2011
> ultimately.

Citing this amended article, Norwood on July 25, 1990, wrote New England Power giving notice that it extended the date by which either side could give notice of an intent to terminate "to November 1, 2001. The effect of this is that the Power Contract between [New England Power] and Norwood would be extended for [ten] years to midnight, October 31, 2008 . . . ."

Norwood argues that the letter was an offer that New England Power failed to accept; but the 1989 amendment, which Norwood explicitly invokes in the 1990 letter, gives Norwood a unilateral election to extend by written notice, which is just what the 1990 letter comprises. Norwood also says that the 1990 letter merely extends the earliest date on which the notice of termination can be given and does not extend the agreement itself; but this is just word play in the context of this contract.

Norwood makes a further contract interpretation argument based on the 1987 amendment which was designed to allow Norwood to reduce its obligation to purchase from New England Power to the extent that Norwood could obtain a lower-cost

-9-

allocation from the New York Power Authority. Norwood's explanation as to how this 1987 amendment supports its position is not persuasive enough to merit detailed response. The short answer is that the 1987 amendment, which had a quite limited focus, was followed by a 1989 amendment providing Norwood an election to extend the obligations through 2008; and this provision for an election, which Norwood exercised, controls any prior terms, whether adopted in 1983 or in 1987.

Norwood's second multi-part argument is that the July 25, 1990, letter was ineffective to extend the contract until 2008 because the letter was never filed with FERC. The governing provision of the Federal Power Act provides that utilities subject to its terms, which includes New England Power with respect to wholesale power sales, must file with FERC:

> schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

16 U.S.C. § 824d(c) (1994) (emphasis added). The statute also requires that any change in a rate or contract must be reflected in a filing with the Commission which, absent a waiver, must be made in advance of the effective date and on sixty days' notice. Id. § 824d(d).

-10-

Although the statute does not say so explicitly, it might be read as saying that an unfiled contract is ineffective; and in any event, FERC regulations say that a public utility may not (to shorten the language to pertinent terms) "collect . . . any rate" or "impose any . . . contract" for FERC-regulated service "which is different from that provided in a rate schedule required to be on file with this Commission unless otherwise specifically provided by order of the Commission for good cause shown." 18 C.F.R. § 35.1(e) (1999). "Rate schedule" is defined to include both a statement of rates and charges for electric service and "all classifications, practices, rules, regulations or contracts which in any manner affect or relate to the aforementioned service, rates, and charges." Id. § 35.2. The importance attributed to filings is reinforced by the so-called filed rate doctrine.

The filed rate doctrine, discussed at greater length in Norwood II, 202 F.3d at 416, 418-22, is actually a set of rules that have evolved over time but revolve around the notion that under statutes like the Federal Power Act, utility filings with the regulatory agency prevail over unfiled contracts or other claims seeking different rates or terms than those reflected in the filings with the agency. See, e.g., AT&T v. Central Office Tel., Inc., 524 U.S. 214, 221-24 (1998); Montana-

-11-

Dakota Utils. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 251-52 (1951). Norwood's theory is that the unfiled July 25, 1990, letter was ineffective because not filed (as required by statute and regulations) and because giving the unfiled letter effect would violate the filed rate doctrine.

In both variations, Norwood's argument depends on the proposition that the July 25, 1990, letter was a contract required to be filed. The gist of the Commission's holding is that the contract was what was set forth in the 1983 contract and the 1989 amendment, both of which were filed with the Commission; the letter merely exercised an election already spelled out in those filings. The Commission also gave other alternative reasons for relying on the 1990 letter, which we will defer for the present.

The reference in the statute and regulations to the filing of "contracts" which affect rates and services is ambiguous. On the one hand, the July 25, 1990, letter is not itself a contract in common usage; it is the exercise of a unilateral election by one party under an already existing contract. On the other hand, the election had the effect of extending the contract term by multiple years, albeit within the framework of the existing contract. If the Commission wanted to characterize such notices as "contracts," it would be a

-12-

linguistic stretch but arguably within the Commission's authority to construe its organic statute and regulations.

However, the Commission has construed the statute and regulations not to encompass a notice of election already provided for by a duly filed contract. This interpretation is subject to substantial deference under the Chevron doctrine.[3] Further, in the Towns of Concord and Wellesley v. FERC, 844 F.2d 891 (1st Cir. 1988), this court upheld a decision of FERC giving effect to an unfiled letter terminating a provision in a filed agreement where the agreement itself contemplated such a termination letter. The analogy offered was to automatic rate adjustment clauses which, "[o]nce the rate schedule is approved, [permit] rate adjustments [to] be made in accordance with the internally-prescribed automatic adjustment clause without further notice to action by the Commission." Id. at 896 (citing 16 U.S.C. § 824d(f)); see also Transwestern Pipeline v. FERC, 897 F.2d 570, 578 (D.C. Cir.), cert. denied, 498 U.S. 952 (1990).

Norwood counters by citing Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571 (1981) ("Arkla"), but we think that case

---

[3]Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45 (1984); see also Mississippi Power & Light Co. v. Mississippi, 487 U.S. 354, 380-82 (1988) (Scalia, J., concurring); City of Cleveland v. FERC, 773 F.2d 1368, 1376 (D.C. Cir. 1985).

-13-

is distinguishable. There, the Supreme Court held that a filed tariff rate for the purchase of natural gas prevailed over Arkla's promise, made in a filed agreement, to pay a higher rate if Arkla paid more to other producers (the "favored nations" clause). But the Supreme Court stressed that it was unclear whether FERC would have accepted the higher rate resulting from the favored nations clause--by contrast to our case; and FERC said in Arkla that its acceptance of the contract did not constitute pre-approval of any rate generated by the favored nations clause. See Arkla, 453 U.S. at 578-82 & n.11.

Needless to say, without the filing of the July 25, 1990, letter, no outsider could visit the Commission's files and determine whether the election to extend had been exercised. This provides whatever policy argument there might be for a broad interpretation of "contracts" in the statute. But even in the halcyon days of strict public utility regulation, now receding at FERC as elsewhere, see Norwood I, 202 F.3d at 396, there were gaps in what could be gleaned from Commission filings. And this is the kind of grey area--the determination of just what the Commission needs to have filed beyond formal contracts themselves--in which great weight must be given to the Commission's judgment. City of Cleveland v. FERC, 773 F.2d 1368, 1376 (D.C. Cir. 1985).

-14-

We thus conclude that the Commission did not act contrary to the Federal Power Act or its own regulations in giving effect to the unfiled July 25, 1990, letter as an election to extend the term of the contract. By the same token it is unnecessary to elaborate on the filed rate doctrine because giving effect to the notice does not circumvent any filing requirement or contradict any extant filing. This is enough to resolve the claims made by Norwood and makes it unnecessary for us to consider what we regard as more doubtful alternative reasons given by the Commission for its order.

Third, because we accept the Commission's interpretation of the July 25, 1990, letter as representing Norwood's election to extend its contract to 2008, the Mobile-Sierra doctrine invoked by Norwood does not apply. That doctrine prohibits a regulated utility from unilaterally changing the fixed terms of a utilities contract absent a finding by FERC that the existing term adversely affects the public interest. FPC v. Sierra Pacific Power co., 350 U.S. 348, 353-55 (1956); United Gas Pipe Line v. Mobile Gas Serv. Corp., 350 U.S. 332, 343-45 (1956). FERC's reasonable construction of a contract in favor of a public utility is not a unilateral change in the contract.

-15-

In its fourth argument for reversal, Norwood argues that, if New England Power was not required to file the July 25, 1990, letter, then FERC lacked the authority to interpret it. This might be so if the letter's subject matter were outside FERC's jurisdiction--for example, if it addressed only intrastate power sales. Cf. Pennzoil v. FERC, 645 F.2d 360, 382 (5th Cir. 1981), cert. denied, 454 U.S. 1142 (1982). However, there is no doubt that the letter in this case related to a filed contract for the wholesale supply of electric power within FERC's jurisdiction.

FERC sometimes declines to address contract issues even for sales unquestionably within its jurisdiction, see, e.g., Southern Cal. Edison Co., 85 F.E.R.C. ¶ 61,023 (1998), but Norwood makes no claim that FERC is forbidden from interpreting contracts filed with FERC or otherwise relevant to FERC tariffs. Here, the duration of the contract directly affects Norwood's liability under the March 1998 tariff imposing a termination charge; and Norwood itself sought the declaration from FERC as to whether the contract continued past October 1998. The letter was properly considered as a document pertinent to determining the duration of the contract. Cf. Southern Union Co. v. FERC, 857 F.2d 812, 815-16 (D.C. Cir. 1988), cert. denied, 493 U.S. 1072 (1990).

Finally, Norwood offers a procedural objection to the Commission's proceedings. After FERC issued its notice of the filing of Norwood's petition for a declaratory ruling, FERC granted New England Power leave to intervene out of time, and it accepted New England Power's answer to Norwood's petition. Norwood now complains because FERC then denied Norwood's motion for leave to file a reply, citing a FERC procedural rule prohibiting answers to answers. 18 C.F.R. § 385.213(a)(2) (1999).

Perhaps in some situations it might be improper for an agency effectively to deny the petitioner the right to respond to assertions raised for the first time in an answering document, although refusal to allow a formal "reply" is not automatically the same as precluding evidence or argument. The short answer in this case is that nothing in Norwood's proffered reply, which is included in the appendix filed with this court, alters the result: in general, the reply sets forth arguments that were effectively addressed by FERC in its orders or could not affect the outcome in light of dispositive rulings by FERC.

The petition for review is <u>denied</u>.