# United States Court of Appeals
## For the First Circuit

No. 18-1995

SCOTT BREIDING; AMY POLLUTRO; MIKAELA ORTSTEIN-OTERO; BENJAMIN
ROSE; MARGARET LEWIS; RICHARD LEWIS; ERIC LONG; PETER STEERS;
BRADFORD KEITH; JOHN ODUM; DAVID LEIGHTON; DONNA CORDEIRO;
JANICE ANGELILLO; ANNA MARIA FORNINO; MICHELE CASSETTA; JUDY
CENNAMI, on behalf of themselves and others similarly situated,

Plaintiffs, Appellants,

ERIK ALLEN; NICHOLAS CORREIA; JANICE BRADY; OPAL ASH;
ROBERTO PRATS; MARK LEJEUNE,

Plaintiffs,

v.

EVERSOURCE ENERGY, a Massachusetts voluntary association;
AVANGRID, INC., a New York corporation,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Torruella, Selya, and Kayatta,
Circuit Judges.

Thomas M. Sobol, with whom Kristie A. LaSalle, Bradley
Vettraino, Steve W. Berman, Hagens Berman Sobol Shapiro LLP, David
F. Sorensen, Michael Dell'Angelo, Glen L. Abramson, and Berger
Montague PC were on brief, for appellants.
Whitney E. Street, Block & Leviton LLP, Sandeep Vaheesan, and

Open Markets Institute on brief for Open Markets Institute as amicus curiae.

Richard P. Bress and John D. Donovan, Jr., with whom Shannen W. Coffin, Douglas G. Green, Steptoe & Johnson LLP, Chong S. Park, Ropes & Gray LLP, Marguerite M. Sullivan, Allyson M. Maltas, Caroline A. Flynn, and Latham & Watkins LLP were on brief, for appellees.

---

September 18, 2019

---

**KAYATTA**, **Circuit Judge**.  Eversource Energy and Avangrid, Inc. ("the defendants") are two large energy companies that purchase natural gas directly from producers and then resell that gas to retail natural gas consumers throughout New England.  In order to transport the natural gas that the defendants purchase from far-away producers to their own, localized system of pipeline infrastructure for delivery to their customers, the defendants reserve transportation capacity along the interstate Algonquin Gas pipeline.  The plaintiffs, a putative class of retail electricity customers in New England, allege that the defendants strategically reserved excess capacity along the Algonquin Gas pipeline without using or reselling it.  This conduct, they claim, unduly constrained the volume of natural gas flowing through New England, thereby raising wholesale natural gas prices, which in turn resulted in higher retail electricity rates paid by New England electricity consumers.

The plaintiffs brought this lawsuit in the U.S. District Court for the District of Massachusetts, asserting that the defendants' conduct violated section 2 of the Sherman Act, 15 U.S.C. § 2, and various state antitrust and consumer-protection laws.  The district court dismissed the plaintiffs' claims as being barred by the filed-rate doctrine and, alternatively, for lack of antitrust standing and the plaintiffs' failure to plausibly allege a monopolization claim under the Sherman Act.  Although our

reasoning differs from that of the district court in several respects, we agree that the filed-rate doctrine presents an insurmountable hurdle for the plaintiffs' federal and state-law claims. We therefore find no need to reach the district court's alternative grounds for dismissal.

## I.

Because the district court disposed of the plaintiffs' claims on a motion to dismiss for failure to state a claim, Fed. R. Civ. P. 12(b)(6), "we take as true all well-pleaded facts in [their] complaint[], scrutinize them in the light most hospitable to [their] theory of liability, and draw all reasonable inferences therefrom in [their] favor." Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009). In so doing, we may also consider "facts subject to judicial notice, implications from documents incorporated into the complaint, and concessions in the complainant's response to the motion to dismiss." Arturet-Vélez v. R.J. Reynolds Tobacco Co., 429 F.3d 10, 13 n.2 (1st Cir. 2005).

We first trace the regulatory contours of the relevant markets for natural gas and electricity before turning to the details of the plaintiffs' antitrust and unfair competition claims.

## A.

"Wellhead" sales comprise the first step in the chain of market transactions that readies extracted natural gas for

consumption in the form of retail electricity.  At this initial stage, natural gas producers sell natural gas to direct purchasers through gas futures contracts, in which the producer agrees to sell a specific quantity of natural gas at some fixed time in the future to the direct purchaser.  Load-distribution companies (LDCs) -- those entities that locally distribute natural gas, primarily to retail consumers who use the gas for heating and cooking -- have a relatively predictable need for natural gas and, thus, often make use of this type of contract.[1]  Consumers with more variable demand for natural gas, such as power generators, often purchase gas on the secondary wholesale "spot market."  The spot market for natural gas allows direct purchasers that find themselves with rights to excess, unneeded natural gas to resell those rights in the immediate or near future.

The Federal Energy Regulatory Commission (FERC) is the agency charged with implementing and executing the Natural Gas Act (NGA), "a comprehensive scheme of federal regulation of 'all wholesales of natural gas in interstate commerce.'" N. Nat. Gas Co. v. State Corp. Comm'n, 372 U.S. 84, 91 (1963) (quoting Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 682 (1954)); see also 15 U.S.C. § 717c(a) (tasking FERC with ensuring that rates charged

---

[1] The defendants nevertheless point out that LDCs operating in New England do face some variability in demand for natural gas due to rapidly changing weather conditions in the region.

for sales of natural gas within FERC's jurisdiction are "just and reasonable").  Notwithstanding the comprehensiveness of this regulatory scheme, Congress also exempted wellhead sales from FERC's regulatory jurisdiction.  See 15 U.S.C. § 3431(a)(1)(A).  Accordingly, market forces dictate the wellhead price of natural gas.  Id. § 3431(b)(1)(A) ("[A]ny amount paid in any first sale of natural gas shall be deemed to be just and reasonable.").  And while the NGA grants FERC regulatory authority over "sale[s] . . . for resale" in the spot market for natural gas, see 15 U.S.C. § 717(b), FERC has issued a "blanket certificate of public convenience and necessity" that allows such transactions to proceed at market rates, see 18 C.F.R. § 284.402.

Direct purchasers of natural gas also pay for the transmission of natural gas from the wellhead.  The Algonquin Gas pipeline serves as the primary interstate artery through which natural gas is transported in New England.  Direct purchasers in New England must reserve transmission capacity -- that is, the physical space in the pipeline needed to transport the natural gas purchased from the producer -- along the Algonquin pipeline commensurate with their transportation needs.  FERC also has "exclusive jurisdiction over the transportation . . . of natural gas in interstate commerce for resale" and is charged with "determin[ing] a 'just and reasonable' rate for [its] transportation."  Schneidewind v. ANR Pipeline Co., 485 U.S. 293,

300-01 (1988).  Pursuant to this exclusive authority, FERC requires interstate pipeline operators like Algonquin to allow LDCs to purchase capacity using "no-notice" contracts.  See Order No. 636, 57 Fed. Reg. 13,267 (Apr. 16, 1992).  Such contracts allow LDCs to adjust capacity reservations downward or upward (up to their daily "firm entitlements") at any time without incurring penalties.  Id. at 13,286.  Importantly, FERC regulations allow, but do not require, LDCs to resell unneeded transportation capacity to other natural gas purchasers when they downwardly adjust their capacity reservations.  See 18 C.F.R. § 284.8; Tenn. Gas Pipeline Co., 102 FERC ¶ 61,075, 61,119 (2003) ("[N]othing requires a shipper to release its capacity:  it does so by choice.").

In the wholesale market for electricity, load-serving entities (LSEs) that sell and deliver electricity to consumers for retail consumption purchase electricity from power generators. The Federal Power Act (FPA) charges FERC with regulating these wholesale sales[2] of electricity in interstate commerce and ensuring that rates in that market are "just and reasonable."  See 16 U.S.C. §§ 824(b)(1), 824d(a).  In executing that charge, FERC has delegated authority to nonprofit organizations, including independent system operators (ISOs), to manage auctions for wholesale electricity in the various regional markets across the

_____

[2] A "[s]ale of electric energy at wholesale" is a "sale of electric energy to any person for resale."  16 U.S.C. § 824(d).

- 7 -

country.  Hughes v. Talen Energy Mktg., LLC, 136 S. Ct. 1288, 1292 (2016).  ISO New England (ISO-NE) oversees the markets for wholesale electricity in the New England region and administers two auctions for wholesale electricity that are relevant to this appeal: a same-day auction and a next-day auction to satisfy LSEs' short-term and near-term demand for electricity.  In both auctions, ISO-NE accepts orders from LSEs designating the amount of energy they need at a given time.  Power generators then submit bids indicating the amount of electricity they can produce at those times and the price they are willing to charge for it.  ISO-NE accepts those bids from lowest to highest until demand is satisfied.  The price of the last accepted bid is the "clearing price," which sets the price paid to all the generators whose bids were accepted.

Approximately half of New England's electricity is generated from natural gas power plants.  As a result, bids from natural gas generators usually set the clearing price for wholesale electricity, which then drives the retail prices charged by LSEs to retail consumers.  FERC does not oversee the retail sale of electricity.  See FERC v. Elec. Power Supply Ass'n, 136 S. Ct. 760, 766 (2016) ("[T]he law places beyond FERC's power, and leaves to the States alone, the regulation of 'any other sale' -- most notably, any retail sale -- of electricity." (citing 16 U.S.C. § 824(b)).

- 8 -

**B.**

Defendants Eversource Energy and Avangrid, Inc. are energy companies that own two of the eight largest natural gas LDCs in New England. They also own multiple retail electricity LSEs in the region. The plaintiffs allege that the defendants violated the Sherman Act and state consumer-protection and antitrust laws by artificially restricting the supply of natural gas in the New England transmission market. This restriction, in turn, increased the cost of natural gas in the spot market, and led to higher wholesale electricity prices and, ultimately, higher retail electricity prices paid by consumers.

According to the plaintiffs, the defendants accomplished this scheme by manipulating their no-notice contracts for pipeline transmission capacity. By consistently reserving in advance and then cancelling at the end of each day significant amounts of transmission capacity without reselling that excess capacity to other LDCs or power generators, the defendants' collective conduct reduced the daily effective capacity along the Algonquin Gas pipeline by 14%, raising natural gas prices by 38% in the natural gas spot market, and increasing retail electricity prices by 20%. The defendants, who hold significant stakes in non-natural gas power-generating facilities, benefited from this practice because it artificially increased the demand for and value of these non-natural gas resources. It also enabled the defendants to advocate

for the construction of costly (and allegedly unnecessary) energy infrastructure projects throughout New England.

The district court dismissed the plaintiffs' claims, holding that the filed-rate doctrine barred their federal antitrust and derivative state suits. Breiding v. Eversource Energy, 344 F. Supp. 3d 433, 451 (D. Mass. 2018). The "filed rate" upon which the district court primarily relied was FERC's approval of market-based rates in the electricity market administered by ISO-NE. Id. at 447–48. The court held, in the alternative, that plaintiffs failed to show antitrust standing and failed to plead a plausible claim of antitrust monopolization. Id. at 456, 458. Unsatisfied with the district court's disposition of their claims, the plaintiffs filed this timely appeal.

## II.

At oral argument, counsel for the plaintiffs conceded that the plaintiffs do not have antitrust standing to bring their federal antitrust damages claim. Nevertheless, the plaintiffs continue to press their state-law claims and their federal antitrust claim for injunctive relief on appeal. Accordingly, we consider those claims on the merits, addressing first the plaintiffs' remaining federal antitrust challenge before turning to the district court's disposition of the plaintiffs' state-law claims. Our review is de novo. See Abdallah v. Bain Capital LLC, 752 F.3d 114, 119 (1st Cir. 2014).

## A.

The filed-rate doctrine is "a set of rules that have evolved over time but revolve around the notion that . . . utility filings with the regulatory agency prevail over . . . other claims seeking different rates or terms than those reflected in the filings with the agency."  Town of Norwood v. FERC, 217 F.3d 24, 28 (1st Cir. 2000).  "[O]nce filed, a rate may not be collaterally attacked in the courts."  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law:  An Analysis of Antitrust Principles and Their Application ¶ 247 (4th ed. 2019).  This rule applies with equal force to challenges brought "under state law and federal antitrust laws to rates set by federal agencies."  E. & J. Gallo Winery v. EnCana Corp., 503 F.3d 1027, 1033 (9th Cir. 2007).  Accordingly, the doctrine can be understood as "a form of deference and preemption, which precludes interference with the rate setting authority of an administrative agency, like FERC."  Wah Chang v. Duke Energy Trading & Mktg., LLC, 507 F.3d 1222, 1225 (9th Cir. 2007).  The filed-rate doctrine does not apply only to "traditional" rates for service; rather, it "sweeps more broadly and governs ancillary conditions and terms included in [a FERC-approved] tariff" as well.  Town of Norwood v. New Eng. Power Co., 202 F.3d 408, 416 (1st Cir. 2000).

Importantly, the doctrine prohibits antitrust challenges to agency-approved tariffs even in energy markets in which FERC

- 11 -

has eschewed traditional ratemaking. See, e.g., id. at 419 (rejecting the argument that the doctrine does not apply when regulated rates are left to the "free market," and observing that "[i]t is the filing of the tariffs, and not any affirmative approval or scrutiny by the agency, that triggers the filed rate doctrine"); Pub. Util. Dist. No. 1 of Snohomish Cty. v. Dynegy Power Mktg., Inc., 384 F.3d 756, 760 (9th Cir. 2004) (applying the doctrine to alleged anticompetitive behavior in the wholesale electricity market). But cf. Town of Norwood, 202 F.3d at 419 ("Of course, if [the defendant's] rates were truly left to the market, with no filing requirement or FERC supervision at all, the filed rate doctrine would by its terms no longer operate."). In short, just as FERC might approve a specified rate as just and reasonable, it might also determine that rates produced in a competitive market that it oversees are just and reasonable. The filed-rate doctrine applies just the same, so long as a FERC-approved tariff governs those market transactions.

The plaintiffs maintained below, and argue on appeal, that the filed-rate doctrine should not bar their claims because they challenge the defendants' anticompetitive conduct in the spot market for natural gas, a market in which "FERC has abdicated its regulatory oversight." The district court rejected that argument, reasoning that the plaintiffs' requested relief would require it to determine "the reasonableness of wholesale electricity prices

exclusively regulated by FERC" and "the difference between wholesale electricity rates during the class period and hypothetical rates that would have been charged but for [the defendants'] purported anticompetitive conduct" -- "exactly the analysis," according to the district court, that "the filed rate doctrine prohibits." Breiding, 344 F. Supp. 3d at 447.

We agree with the plaintiffs that the district court's reasoning is in some tension with our previous opinion in Town of Norwood. In that case, we deemed the filed-rate doctrine inapplicable to an antitrust challenge that alleged that a power generator sold its non-nuclear generating assets in order to reduce the supply of wholesale electricity in the New England market and "exert upward pressure" on wholesale electricity prices. 202 F.3d at 422-23. In doing so, we found that a FERC-issued tariff in the wholesale electricity market did not bar a challenge to a merger of generators merely because the merger affected wholesale energy rates. See id. at 422. And in reaching that conclusion, we observed that though "it is not clear in all cases where the boundary lies between the filed rate doctrine and the default rule retaining antitrust liability," FERC did not have the "explicit power to immunize approved mergers." Id.; see also id. (noting that though "[d]irect antitrust attacks on federally regulated rates" and "attacks on other regulated matters underlying rates" "have . . . been limited by the filed rate doctrine," there is "no

- 13 -

across-the-board antitrust immunity for agency-approved transactions" (citing California v. Fed. Power Comm'n, 369 U.S. 482 (1962)). Our decision in Town of Norwood comports with the weight of the case law, which generally deems the filed-rate doctrine inapplicable to challenges to upstream, non-jurisdictional activity that indirectly affects downstream FERC-approved tariffs. See, e.g., Sierra Pac. Res. v. El Paso Corp., 250 F. App'x 776, 777-78 (9th Cir. 2007) (finding the filed-rate doctrine inapplicable to plaintiffs' challenges to non-jurisdictional "first sales" of natural gas); E. & J. Gallo Winery, 503 F.3d at 1046-48 (same); cf. Brown v. Ticor Title Ins. Co., 982 F.2d 386, 394 (9th Cir. 1992) ("[I]f those rates were the product of unlawful activity prior to their being filed and were not subjected to meaningful review by the state, then the fact that they were filed does not render them immune from challenge."). But see Dynegy Power Mktg., 384 F.3d at 759 (finding the filed-rate doctrine applicable when the defendant "withheld supply, waited until emergency conditions were declared and prices rose, and then offered the[] supply at [a] higher price").

The district court's invocation of the FERC-approved ISO-NE tariff, which governs transactions in the wholesale electricity market, to bar the plaintiffs' challenge to upstream conduct affecting the spot market for natural gas implicates analogous, difficult questions concerning the precise reach of the

filed-rate doctrine.  As we explain, however, the instant appeal does not require that we endorse or reject the broad application of the filed-rate doctrine espoused by the district court.  Rather, we train our attention on a different FERC tariff that is directly implicated by plaintiffs' claims:  the tariff approved for sales and purchases of natural gas transmission capacity.

All of the conduct that the plaintiffs say violates federal and state law occurred in the natural gas transmission market.  Distilled to its essence, the plaintiffs' description of that conduct is as follows:  (1) "Eversource and Avangrid possess a large number of 'no-notice' contracts for natural gas transmission capacity along the Algonquin Pipeline"; and (2) "Eversource and Avangrid regularly reserved more pipeline capacity than they knew they needed and then, at the last minute, cancelled portions of their reservations" without "releas[ing] that capacity, so that others could take advantage of it." Accordingly, if there exists any tension between what the plaintiffs say is wrongful conduct and any agency-sanctioned tariff, it is most clearly and most directly with the FERC-approved tariffs in the natural gas transmission market.  So, to determine whether the filed-rate doctrine bars the plaintiffs' claims, we start -- and ultimately end -- our inquiry there.

Pursuant to FERC's exclusive authority to regulate natural gas transmission, FERC mandates that natural gas companies

file "schedules showing all rates and charges for any [jurisdictional] transportation or sale of natural gas." 18 C.F.R. § 154.1(b). In addition, FERC requires operators of interstate natural gas pipelines like the Algonquin Gas pipeline to provide "'no-notice' transportation service" to ensure that LDCs are able to meet unexpected demand. Order No. 636, 57 Fed. Reg. at 13,286.

In accordance with these mandates, the FERC-approved tariff for the Algonquin Gas pipeline includes Algonquin's statement of rates and rate schedule for transportation services along the pipeline. See Algonquin Gas Transmission, LLC Tariff, pts. 4–5 [hereinafter Algonquin Tariff]. The tariff also addresses no-notice contracts and provides, in relevant part:

> Notwithstanding the quantities nominated by Customer and scheduled by Algonquin hereunder, Customer shall be entitled to increase its deliveries up to the [Maximum Daily Delivery Obligation] at any Primary Point(s) of Delivery, up to the [Maximum Hourly Transportation Quantity] during any Hour, and up to the [Maximum Daily Transportation Quantity], or to decrease its deliveries. Provided that all of the operational conditions specified in Section 5 of this rate schedule (the "Section 5 Conditions") are met, Algonquin shall consent to such increase or decrease in deliveries, thereby nullifying any daily scheduling or hourly scheduling penalty that would otherwise be applicable pursuant to Section 23 of the General Terms and Conditions.

Algonquin Tariff, pt. 5, Rate Schedule AFT-E, § 4.3. Furthermore, that tariff, consonant with FERC's regulations, see 18 C.F.R.

- 16 -

§ 284.8, permits an LDC to resell its excess reserved capacity: "A Customer under any firm rate schedule under Part 284 may release all or a part of its capacity under an Existing Service Agreement . . . ."  Algonquin Tariff, pt. 6, Capacity Release, § 14.2.  But the tariff says nothing that would require an LDC to release excess capacity along the Algonquin pipeline to other users.

In the plaintiffs' amended complaint, neither defendant is alleged to have engaged in any conduct other than that allowed by Algonquin's detailed and reasonably comprehensive FERC-approved tariff.  FERC, in conformity with its broader regulatory scheme, expressly declined to require direct purchasers to release excess capacity in recognition of the fact that direct purchasers facing variable demand for natural gas might need to retain that capacity to ensure reliability.  See, e.g., Order No. 636, 57 Fed. Reg. at 13,269 ("[T]he Commission is providing for a 'no-notice' transportation service in response to those who have expressed a particular concern about reliability during peak periods.").  The filed-rate doctrine prohibits us from questioning that reasoned judgment in this lawsuit.

All of the defendants' alleged misconduct, we might add, was done in the open and in plain view of Algonquin, the defendants' competitors, and FERC.  Furthermore, maintaining the efficient use of limited transmission capacity falls squarely

within the bull's-eye of FERC's regulatory aims.  See, e.g., id. ("The Commission's primary aim in adopting the instant regulations is to improve the competitive structure of the natural gas industry and at the same time maintain an adequate and reliable service."). And Congress has given FERC the tools to police anticompetitive conduct in the market for transmission capacity.  The NGA makes it "unlawful for any entity, directly or indirectly, to use or employ, in connection with . . . the purchase or sale of transportation services subject to the jurisdiction of [FERC], any manipulative or deceptive device or contrivance . . . in contravention of such rules and regulations as [FERC] may prescribe."  15 U.S.C. § 717c-1.  All parties acknowledge that this provision and FERC's implementing regulation, see 18 C.F.R. § 1c.1(a), "prohibit[] the anticompetitive abuse of no-notice contracts" in the market for natural gas transmission.  Moreover, Congress empowered FERC to investigate and bring civil enforcement actions against willful and knowing violators of the NGA and FERC's regulations.  See 15 U.S.C. § 717t-1; see also Enf't of Statutes, Orders, Rules, & Regulations, 132 FERC ¶ 61,216, 62,149 (2010) (explaining that FERC also requires disgorgement of "profits illegally obtained . . . to those who were harmed by the violations").  And, in fact, FERC did investigate the defendants' alleged manipulation of their no-notice contracts but found "no evidence of anticompetitive withholding of natural gas pipeline capacity."

News Release: FERC Staff Inquiry Finds No Withholding of Pipeline Capacity in New England Markets, Fed. Energy Regulatory Comm'n (Feb. 27, 2018), https://www.ferc.gov/media/news-releases/2018/2018-1/02-27-18.pdf.

On appeal, the plaintiffs acknowledge that challenges to "practices over which FERC ha[s] jurisdiction and actually regulate[s]" are barred pursuant to the filed-rate doctrine. As a general matter, we agree (at least in so far as those practices are included in a FERC-approved tariff as an exercise of FERC's ratemaking authority, see Town of Norwood, 202 F.3d at 416). For this reason, it seems quite clear that the filed-rate doctrine precludes the plaintiffs' claims in this suit.

The plaintiffs' principal rejoinder to this conclusion rests on the fact that they now seek only injunctive relief. They point to the Supreme Court's decision in Georgia v. Pa. R.R. Co., 324 U.S. 439, 455 (1945) (finding the filed-rate doctrine inapplicable to an equitable claim that was not "a matter subject to the jurisdiction of the [agency]," did not request "an injunction against the continuance of any tariff," and did not "seek to have any tariff provision cancelled"). But in Town of Norwood, we explained that injunctive relief that "would require the alteration of [a] tariff[]" that FERC "actually scrutinized" is incompatible with the doctrine's purpose of "protect[ing] the exclusive authority of the agency to accept or challenge such tariffs." 202 F.3d at 420. To rule against the defendants and

- 19 -

grant the plaintiffs' requested "order[,] enjoining defendants from further engaging in the unlawful conduct described in th[e] Complaint," a judge would need to direct, in substance and effect, that the defendants not hold on to excess, unused capacity without reselling it. Of course, one might argue that such an order would not directly conflict with the tariff because the tariff does not actually prohibit the resale of capacity. FERC's regulation of transmission along the Algonquin Gas pipeline, though, is sufficiently comprehensive and detailed such that a judge-mandated elimination of the purchaser's freedom to choose whether to resell excess capacity would effectively overrule, or at least qualify, FERC's decision that the LDC's "may" release their reserved capacity. Accordingly, the plaintiffs' federal antitrust claim fails.

## B.

That leaves the plaintiffs' state-law claims. As already explained, the filed-rate doctrine applies with equal force to state-law challenges. See E. & J. Gallo Winery, 503 F.3d at 1033. Nor do the plaintiffs argue otherwise in their brief on appeal. So, it would seem to follow from the foregoing analysis that dismissal of the plaintiffs' state claims is also warranted. We nevertheless hesitate because it is not immediately clear from the district court's opinion whether the court dismissed the plaintiffs' state claims for the same reasons that it deemed the

federal claims non-cognizable or whether the court declined to exercise supplemental jurisdiction over those state claims upon determining that the plaintiffs could not proceed with their federal claims, thereby leaving open the possibility that the plaintiffs might pursue their state claims in a separate action in state court.

On the one hand, the district court made clear that the filed-rate doctrine barred both the plaintiffs' federal and state-law claims, see Breiding, 344 F. Supp. 3d at 451 ("[T]he Court holds that the doctrine bars the federal and state law claims in the amended complaint."), and went on to conclude that the plaintiffs' alleged injuries were "too remote to satisfy the causation prongs of the various state law claims," id. at 459. On the other hand, the district court concluded its opinion with the following statement: "[T]he Court, for the reasons previously mentioned, has dismissed all of Plaintiffs' federal claims and declines to exercise jurisdiction over the remaining state law claims." Id. The district court then entered an order dismissing the plaintiffs' complaint without mentioning whether the dismissal was with prejudice or not. The district court also made no mention of the plaintiffs' alternative invocation of federal-court jurisdiction under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2) (creating original jurisdiction over class actions

with minimal diversity and aggregate damages that exceed $5,000,000).

We construe the district court's opinion as dismissing the plaintiffs' state-law claims on the merits, notwithstanding the court's mixed signals, for the following reasons. First, the district court, in "declin[ing] to exercise jurisdiction over the remaining state law claims," appeared to do so as an alternative basis for dismissing those challenges, perhaps in contemplation of the possibility that we might disagree with its application of the filed-rate doctrine to the plaintiffs' claims. See id. at 458 ("Although the filed rate doctrine applies with equal force to Plaintiffs' state law claims, the Court concludes that Plaintiffs' state law claims also fail for the reasons stated below." (citation omitted)). Having concluded that the filed-rate doctrine does, indeed, bar all the plaintiffs' claims, we have no need to reach the district court's alternative bases for dismissal.

Second, it would have made little sense to decline to exercise supplemental jurisdiction over the residual state-law claims for purposes of dismissing them after finding the plaintiffs' federal claims non-cognizable due to the filed-rate doctrine. To be sure, normally "the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit . . . will trigger the dismissal without prejudice of any supplemental state-law claims." Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168,

1177 (1st Cir. 1995). But "[i]n an appropriate situation, a federal court may retain jurisdiction over state-law claims notwithstanding the early demise of all foundational federal claims." Id. In deciding whether to do so, federal courts consider "the interests of fairness, judicial economy, convenience, and comity." Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998). Here, the interests of fairness, judicial economy, and convenience all support retaining jurisdiction because the survival of the plaintiffs' state and federal claims hinges on an application of the filed-rate doctrine to the plaintiffs' complaint. That the doctrine applies with equal effect and vigor to the plaintiffs' state-law claims, in turn, is effectively undisputed. Furthermore, in order to affirm a decision to decline supplemental jurisdiction, we would first need to determine whether original jurisdiction exists under CAFA, a matter not briefed by the parties. Finally, retaining jurisdiction to dismiss the state-law claims would raise no comity concerns because the dismissal of those claims would not turn on an application of state law.

Having so construed the district court's opinion, we find that the plaintiffs' state-law challenges are also barred by the filed-rate doctrine for the reasons described above.

## III.

Because we find that all of the plaintiffs' claims are defeated by application of the filed-rate doctrine, we <u>affirm</u> the district court's dismissal of the plaintiffs' federal antitrust and state-law claims. Nothing in this holding approves or disapproves of any of the defendants' conduct. We simply hold that the plaintiffs' allegations, assuming their truth, describe an issue for FERC to address.