# United States Court of Appeals
## For the First Circuit

No. 19-1678

PNE ENERGY SUPPLY LLC, on behalf of itself
and all others similarly situated,

Plaintiff, Appellant,

v.

EVERSOURCE ENERGY, a Massachusetts Voluntary Association;
AVANGRID, INC., a New York Corporation,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Thompson, Lipez, and Kayatta,
Circuit Judges.

Austin B. Cohen, Keith J. Verrier, Levin Sedran & Berman LLP, Anthony Tarricone, and Kreindler & Kreindler LLP on brief for appellant.

Mark A. Gottlieb, Public Health Advocacy Institute, Sandeep Vaheesan, Open Markets Institute, Paula S. Bliss, and Bernheim Dolinsky Kelley LLC on brief for Open Markets Institute, amicus curiae.

Douglas G. Green, Shannen W. Coffin, Mark C. Savignac, Steptoe & Johnson LLP, John D. Donovan, Jr., Chong S. Park, and Ropes & Gray LLP on joint brief for appellee Eversource Energy.

Richard P. Bress, Marguerite M. Sullivan, Caroline A. Flynn, and Latham & Watkins LLP on joint brief for appellee Avangrid, Inc.

September 9, 2020

**KAYATTA**, **Circuit Judge**. In 2017, a group of economists working with the Environmental Defense Fund published a report alleging that the defendants in this case were able to increase electricity prices in New England about 20% on average, totaling $3.6 billion in surcharges over three years between 2013 and 2016, by buying up and refusing to release excess transmission capacity in the Algonquin pipeline. See Levi Marks et al., Vertical Market Power in Interconnected Natural Gas and Electricity Markets 4 (2017), https://www.edf.org/sites/default/files/vertical-market-power.pdf. In response, a group of electricity end consumers filed suit in November 2017 alleging violations of state and federal antitrust and unfair competition law. See Breiding v. Eversource Energy, 344 F. Supp. 3d 433, 444 (D. Mass. 2018), aff'd, 939 F.3d 47 (1st Cir. 2019). After the defendants challenged the electricity consumers' standing to sue under the federal antitrust laws for manipulation in gas transmission markets, PNE Energy Supply LLC, a wholesale energy purchaser, filed this lawsuit on behalf of itself and other similarly situated energy purchasers, also challenging the defendants' alleged manipulation of natural gas pipeline capacity. Last fall, we affirmed the dismissal of the electricity consumers' suit. Breiding, 939 F.3d at 57. Rather than taking up the defendants' challenge to the electricity consumers' antitrust standing, we held that the antitrust claims failed on their merits because the defendants' challenged conduct,

in neither using nor releasing reserved pipeline capacity, all occurred pursuant to a tariff approved by the Federal Energy Regulatory Commission.  Id. at 52-56.  We now consider in this second case whether any differences between the two cases warrant a different outcome.  For the following reasons, we find that Breiding controls.  We therefore affirm the dismissal of this case.

**I.**

**A.**

To provide context regarding the relevant energy market and actors at issue in this case, we begin by repeating verbatim the description we provided in Breiding, 939 F.3d at 49-51:

\*     \*     \*

"Wellhead" sales comprise the first step in the chain of market transactions that readies extracted natural gas for consumption in the form of retail electricity.  At this initial stage, natural gas producers sell natural gas to direct purchasers through gas futures contracts, in which the producer agrees to sell a specific quantity of natural gas at some fixed time in the future to the direct purchaser.  Load-distribution companies (LDCs) -- those entities that locally distribute natural gas, primarily to retail consumers who use the gas for heating and cooking -- have a relatively predictable need for natural gas and,

- 4 -

thus, often make use of this type of contract.[1] Consumers with more variable demand for natural gas, such as power generators, often purchase gas on the secondary wholesale "spot market." The spot market for natural gas allows direct purchasers that find themselves with rights to excess, unneeded natural gas to resell those rights in the immediate or near future.

The Federal Energy Regulatory Commission (FERC) is the agency charged with implementing and executing the Natural Gas Act (NGA), "a comprehensive scheme of federal regulation of 'all wholesales of natural gas in interstate commerce.'" N. Nat. Gas Co. v. State Corp. Comm'n, 372 U.S. 84, 91 (1963) (quoting Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 682 (1954)); see also 15 U.S.C. § 717c(a) (tasking FERC with ensuring that rates charged for sales of natural gas within FERC's jurisdiction are "just and reasonable"). Notwithstanding the comprehensiveness of this regulatory scheme, Congress also exempted wellhead sales from FERC's regulatory jurisdiction. See 15 U.S.C. § 3431(a)(1)(A). Accordingly, market forces dictate the wellhead price of natural gas. Id. § 3431(b)(1)(A) ("[A]ny amount paid in any first sale of natural gas shall be deemed to be just and reasonable."). And while the NGA grants FERC regulatory authority over "sale[s] . . .

---

[1] The defendants nevertheless point out that LDCs operating in New England do face some variability in demand for natural gas due to rapidly changing weather conditions in the region.

for resale" in the spot market for natural gas, see 15 U.S.C. § 717(b), FERC has issued a "blanket certificate of public convenience and necessity" that allows such transactions to proceed at market rates, see 18 C.F.R. § 284.402.

Direct purchasers of natural gas also pay for the transmission of natural gas from the wellhead. The Algonquin Gas pipeline serves as the primary interstate artery through which natural gas is transported in New England. Direct purchasers in New England must reserve transmission capacity -- that is, the physical space in the pipeline needed to transport the natural gas purchased from the producer -- along the Algonquin pipeline commensurate with their transportation needs. FERC also has "exclusive jurisdiction over the transportation . . . of natural gas in interstate commerce for resale" and is charged with "determin[ing] a 'just and reasonable' rate for [its] transportation." Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 300-01 (1988). Pursuant to this exclusive authority, FERC requires interstate pipeline operators like Algonquin to allow LDCs to purchase capacity using "no-notice" contracts. See Order No. 636, 57 Fed. Reg. 13,267 (Apr. 16, 1992). Such contracts allow LDCs to adjust capacity reservations downward or upward (up to their daily "firm entitlements") at any time without incurring penalties. Id. at 13,286. Importantly, FERC regulations allow, but do not require, LDCs to resell unneeded transportation capacity to other

natural gas purchasers when they downwardly adjust their capacity reservations. See 18 C.F.R. § 284.8; Tenn. Gas Pipeline Co., 102 FERC ¶ 61,075, 61,119 (2003) ("[N]othing requires a shipper to release its capacity: it does so by choice.").

In the wholesale market for electricity, load-serving entities (LSEs) that sell and deliver electricity to consumers for retail consumption purchase electricity from power generators. The Federal Power Act (FPA) charges FERC with regulating these wholesale sales[2] of electricity in interstate commerce and ensuring that rates in that market are "just and reasonable." See 16 U.S.C. §§ 824(b)(1), 824d(a). In executing that charge, FERC has delegated authority to nonprofit organizations, including independent system operators (ISOs), to manage auctions for wholesale electricity in the various regional markets across the country. Hughes v. Talen Energy Mktg., LLC, 136 S. Ct. 1288, 1292 (2016). ISO New England (ISO-NE) oversees the markets for wholesale electricity in the New England region and administers two auctions for wholesale electricity that are relevant to this appeal: a same-day auction and a next-day auction to satisfy LSEs' short-term and near-term demand for electricity. In both auctions, ISO-NE accepts orders from LSEs designating the amount of energy they need at a given time. Power generators then submit bids

_____

[2] A "[s]ale of electric energy at wholesale" is a "sale of electric energy to any person for resale." 16 U.S.C. § 824(d).

indicating the amount of electricity they can produce at those times and the price they are willing to charge for it. ISO-NE accepts those bids from lowest to highest until demand is satisfied. The price of the last accepted bid is the "clearing price," which sets the price paid to all the generators whose bids were accepted.

Approximately half of New England's electricity is generated from natural gas power plants. As a result, bids from natural gas generators usually set the clearing price for wholesale electricity, which then drives the retail prices charged by LSEs to retail consumers. FERC does not oversee the retail sale of electricity. See FERC v. Elec. Power Supply Ass'n, 136 S. Ct. 760, 766 (2016) ("[T]he law places beyond FERC's power, and leaves to the States alone, the regulation of 'any other sale' -- most notably, any retail sale -- of electricity." (citing 16 U.S.C. § 824(b))).

* * *

**B.**

In Breiding, we held that the filed-rate doctrine insulated from challenge in a private antitrust lawsuit the defendants' alleged use of no-notice contracts to restrict supply in the Algonquin pipeline transmission capacity market. 939 F.3d at 52-56. "The filed-rate doctrine is 'a set of rules that . . . revolve[s] around the notion that . . . utility filings with the

regulatory agency prevail over . . . other claims seeking different rates or terms than those reflected in the filings with the agency.'" Id. at 52 (second and third omissions in original) (quoting Town of Norwood v. FERC, 217 F.3d 24, 28 (1st Cir. 2000)). It is "a form of deference and preemption, which precludes interference with the rate setting authority of an administrative agency, like FERC." Id. (quoting Wah Chang v. Duke Energy Trading & Mktg., LLC, 507 F.3d 1222, 1225 (9th Cir. 2007)). Significant here, it applies not only to traditional service rates but also to "ancillary conditions and terms included in [a FERC-approved] tariff." Id. (alteration in original) (quoting Town of Norwood v. New Eng. Power Co., 202 F.3d 408, 416 (1st Cir. 2000)).

While the district court in Breiding determined that it was FERC's seal of approval on the downstream (relative to the defendants' alleged failure to release excess capacity) ISO-NE market prices that insulated the defendants' behavior from challenge under the antitrust laws in a district court, see id. at 51-53, we questioned that reasoning and explicitly did not endorse it, see id. at 53-56. Relying on our previous decision in Town of Norwood, 202 F.3d 408, we confirmed that upstream anticompetitive activity that indirectly affects a downstream, FERC-approved tariff is not categorically protected by the filed-rate doctrine applicable to the downstream activity. See Breiding, 939 F.3d at 53. We instead turned our attention to the activity that was

- 9 -

alleged to have been anticompetitive and asked whether that behavior itself had been sanctioned by FERC, id. at 53-55, focusing on a description of the conduct provided by plaintiffs there as follows:

> (1) "Eversource and Avangrid possess a large number of 'no-notice' contracts for natural gas transmission capacity along the Algonquin Pipeline"; and (2) "Eversource and Avangrid regularly reserved more pipeline capacity than they knew they needed and then, at the last minute, cancelled portions of their reservations" without "releas[ing] that capacity, so that others could take advantage of it."

Id. at 54 (alteration in original) (quoting the Breiding complaint). Reviewing the regulations at issue, we saw that "FERC requires operators of interstate natural gas pipelines like the Algonquin Gas pipeline to provide '"no-notice" transportation service' to ensure that LDCs are able to meet unexpected demand." Id. (citing Order No. 636, 57 Fed. Reg. at 13,286). Accordingly, the Algonquin tariff allows an LDC to

> increase its deliveries up to the [Maximum Daily Delivery Obligation] at any Primary Point(s) of Delivery, up to the [Maximum Hourly Transportation Quantity] during any Hour, and up to the [Maximum Daily Transportation Quantity], or to decrease its deliveries. Provided that all of the operational conditions specified in Section 5 of this rate schedule (the "Section 5 Conditions") are met, Algonquin shall consent to such increase or decrease in deliveries, thereby nullifying any daily scheduling or hourly scheduling penalty that would otherwise

- 10 -

be applicable pursuant to Section 23 of the
General Terms and Conditions.

Id. (alterations in original) (quoting Algonquin Gas Transmission, LLC Tariff, pt. 5, Rate Schedule AFT-E, § 4.3).  Similarly, an LDC "may release all or a part of its capacity under an Existing Service Agreement," but nothing requires it to do so.  Id. (quoting Algonquin Gas Transmission, LLC Tariff, pt. 6, Capacity Release, § 14.2).

Putting these allegations and the tariff together, we determined that

> neither defendant is alleged to have engaged in any conduct other than that allowed by Algonquin's detailed and reasonably comprehensive FERC-approved tariff. FERC, in conformity with its broader regulatory scheme, expressly declined to require direct purchasers to release excess capacity in recognition of the fact that direct purchasers facing variable demand for natural gas might need to retain that capacity to ensure reliability.

Id. (citing Order No. 636, 57 Fed. Reg. at 13,269).  Because FERC expressly required that LDCs be allowed to purchase excess capacity and not release it, at their discretion, we determined that "[t]he filed-rate doctrine prohibit[ed] us from questioning that reasoned judgment."  Id. at 55.

- 11 -

## II.

### A.

The question before us is simply whether <u>Breiding</u>'s logic also applies to this lawsuit. We begin our analysis with the most obvious difference between <u>Breiding</u> and this case: the plaintiffs. On issues of antitrust standing, <u>see, e.g.</u>, <u>Lorenzo v. Qualcomm Inc.</u>, 603 F. Supp. 2d 1291, 1300-01 (S.D. Cal. 2009), including the application of federal direct purchaser requirements, <u>see</u> <u>Ill. Brick Co.</u> v. <u>Illinois</u>, 431 U.S. 720, 728-29 (1977), the different positions occupied in the chain of sales that link plaintiffs to the alleged wrongdoers can make a difference. But because <u>Breiding</u> did not rest on such considerations, the parties' differing status similarly makes no difference to the outcome here.

### B.

We consider next the challenged conduct. Examination of PNE's complaint confirms that it seeks to impose antitrust liability for the exact same conduct at issue in <u>Breiding</u>: The alleged overscheduling and withholding of transmission capacity under defendants' contracts with Algonquin pursuant to Algonquin's FERC-approved tariff. Mining its own complaint for tidbits and inferences that do not appear to have been featured in <u>Breiding</u>, PNE nevertheless contends that we can fairly view the defendants'

conduct as something more than what we considered in Breiding for two reasons.

First, PNE argues that the challenged activity took the form of a "refus[al] to deal" in the so-called short-term secondary capacity market, a market not alleged in Breiding and not regulated by the FERC tariff. Second, it argues that the defendants manipulated a price index, the Algonquin Citygate Price, which manipulation PNE contends differs from failing to release excess capacity. We address each of these arguments in turn.

**1.**

PNE contends that Breiding does not control because Breiding focused "solely on Defendants' use of no-notice contracts," while PNE focuses on what defendants "refused" to do in the short-term "Secondary Capacity Market." Instead of simply failing to release the excess transportation capacity to the primary capacity market, PNE argues, the defendants could have sold their extra capacity in this secondary market, either by itself or bundled with any excess natural gas to be transported. But the claim in Breiding was precisely that the defendants "reserved excess capacity . . . without using or reselling it." Breiding, 939 F.3d at 49 (emphasis added). "[R]efusing to sell," as PNE chooses to label the behavior, is just another way of saying "without . . . reselling." And the Breiding plaintiffs claimed as well the same target of the alleged refusal to sell: increased

- 13 -

wholesale natural gas prices, which in turn resulted in higher electricity prices.  Id.  In both cases, the pivotal challenged conduct was the alleged over-reserving of and then failure to release gas transportation rights exercised under the defendants' contracts with the Algonquin pipeline, the terms of which were specifically allowed by FERC.  Because we found the balancing of competition and reliability of natural gas supply, given the market's limited transmission capacity, to be within the "bull's-eye of FERC's regulatory aims," id. at 55, we saw no reason to allow a jury in a private antitrust action to second-guess FERC's approach.

Specifically, as we noted in Breiding, release of capacity into this secondary market is expressly regulated by FERC through 18 C.F.R. § 284.8, which contains a detailed set of requirements for how and when a shipper may, "by choice," release capacity, including bidding requirements and other contractual and regulatory guarantees.  See 939 F.3d at 50 (quoting Tenn. Gas Pipeline Co., 102 FERC ¶ 61,075, 61,119 (2003)).  In other words, how and under what terms a shipper is to release any capacity falls precisely within FERC's regulatory purview.  As we discuss below, see infra Part II.D., FERC has issued an order determining that market-based rates for short-term capacity releases are just and reasonable.  Promotion of a More Efficient Capacity Release Market, 123 FERC ¶ 61,286, ¶ 31 (June 19, 2008) (noting further that FERC

is "not relying solely on competition to ensure just and reasonable prices" but is rather "maintaining the rate cap on pipeline services that will provide the same protection for capacity release transactions as it now does for pipeline negotiated rate transactions"). Such an order does not transfer from FERC to the federal courts oversight of whether this market is functioning in a manner that makes for just and reasonable rates.

PNE argues that, because "no rate limitation applies" under the regulations to certain capacity releases at issue here, these transactions fall outside of FERC's purview. See 18 C.F.R. § 284.8(b)(2). But this provision was added as part of FERC's determination that it would use market rates to satisfy the requirement that capacity release transactions are just and reasonable. See Promotion of a More Efficient Capacity Release Market, 73 Fed. Reg. 72,692-01, at 72,963 (Dec. 1, 2008) (noting that, "in order to enhance the efficiency and effectiveness of the secondary capacity release market," FERC lifted "the maximum rate ceiling on secondary capacity releases of one year or less"). In other words, unlike wellhead sales, for example, releases of capacity still fall within FERC's jurisdiction, and a market-based system is simply the mechanism that FERC has opted to use to secure just and reasonable rates. It does not follow, therefore, that this market is "unregulated." To the contrary, noting its continued "[o]versight" of capacity releases, FERC stated it "will

entertain complaints and respond to specific allegations of market power on a case-by-case basis if necessary. Furthermore, the Commission directs staff to monitor the capacity release program . . . using all available information." Promotion of a More Efficient Capacity Release Market, 123 FERC at ¶ 56. And it will "require[] informational postings of capacity release transactions [to] provide transparency and facilitate the filing of complaints if circumstances warrant." Id. ¶ 31.

Reframing and seeking to supplement the foregoing "refusal" to deal theory as distinguishing this case from Breiding, PNE also argues that the Breiding plaintiffs made no allegations regarding other possible economic activity in the secondary capacity market, instead "focusing solely" on the "no-notice contracts" in the primary capacity market. The Breiding plaintiffs, PNE contends, did not mention everything else defendants did not do that restricted supply in the gas transmission market: "[E]nter[] into bilateral agreements where they sold their excess capacity without releasing it, or bundle[] their capacity with gas and s[ell] it on the spot market; or . . . s[ell] gas that they had stored locally without requiring pipeline access."

The allegations in the complaint that PNE claims support this theory are sparse at best,[3] but taking them as true and drawing reasonable inferences in PNE's favor, we find no rescue for PNE's claim. Two of these economic activities allegedly eschewed by defendants actually hinged on reselling capacity on the pipeline, so fail for the reasons already stated. The last allegedly eschewed activity -- not selling locally stored gas -- fares no better. The complaint contains no allegations that any such hoarding of physical gas has meaningful anticompetitive effects independent of any transmission capacity constraints. PNE's allegations center on the theory that whatever excess gas exists in the New England energy market cannot be utilized because the Algonquin pipeline often sits underfilled due to defendants' failure to release capacity. There is no claim that gas for which unreserved transmission capacity exists is being withheld from the market. Nor is there any claim that defendants have market power in the physical natural gas market. Indeed, no party to whom defendants have allegedly refused to sell any such gas has joined the complaint in this case.

---

[3] The extent of such allegations is that "[t]he relevant natural gas market is the 'secondary capacity market' which includes the spot market for the sale of natural gas and the related 'excess capacity release' market for gas transmission services (i.e., incorporating the excess capacity release market and other short-term capacity transactions, whether bundled with the physical commodity or not)."

## 2.

PNE next argues that the defendants manipulated the Algonquin Citygate Price index and that such manipulation somehow makes the filed-rate doctrine inapplicable. But the manipulation described in the complaint centers on the defendants' refusal to promptly release or sell transmission capacity, which purportedly drove up the average price of natural gas, thereby also increasing the index price. As PNE describes the relationship, "by over-scheduling and withholding their excess capacity, [defendants] could drive up natural gas generators' input costs." In other words, "[d]efendants knew that by driving up the price of natural gas in the unregulated spot market they drove up the Algonquin Citygate Price and the corresponding bids submitted by gas-powered generators in the electricity auction." This is but another way of saying that defendants drove up prices by not releasing pipeline capacity.

## C.

Taking a different tack, PNE argues that the tariff itself includes a clause that allows PNE to bring an antitrust claim to enforce the tariff. The clause in question, Section 17, states only that "all terms and provisions contained or incorporated [in this tariff], and the respective obligations of the parties thereunder, are subject to valid laws, orders, rules and regulations of duly constituted authorities having

- 18 -

jurisdiction." We see nothing in this language granting PNE any right to enforce the tariff. PNE cites only a case under the Federal Communications Act (FCA), which contains a clause allowing private parties to recover damages from common carriers who violate the FCA. See Brown v. MCI WorldCom Network Servs., Inc., 277 F.3d 1166, 1169-72 (9th Cir. 2002) (construing 47 U.S.C. §§ 206-207). PNE ignores more pertinent authority to the contrary. See California ex rel. Lockyer v. Dynegy, Inc., 375 F.3d 831, 852 (9th Cir.) (holding that "substantive provisions of the tariff" are "an area reserved exclusively to FERC, both to enforce and to seek remedy"), opinion amended on denial of reh'g, 387 F.3d 966 (9th Cir. 2004); see also Pub. Util. Dist. No. 1 v. Dynegy Power Mktg., Inc., 384 F.3d 756, 762 (9th Cir. 2004) (same, citing Lockyer). Compare 47 U.S.C. § 207 ("Any person claiming to be damaged by any common carrier subject to the provisions of [the FCA] . . . may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction . . . ."), with 15 U.S.C. § 717s ("Whenever it shall appear to [FERC] that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper district court . . . to enjoin such acts or

practices . . . ."), 15 U.S.C. § 717*l* (noting that government parties may bring complaints to FERC), and 15 U.S.C. § 717m (granting FERC power to investigate violations of the NGA). With respect to criminal antitrust enforcement, for example, the NGA specifically states that FERC "may transmit such evidence as may be available concerning such acts or practices or concerning apparent violations of the Federal antitrust laws to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings." Id. § 717s(a).

Nor does PNE explain how this clause grants jurisdiction to review tariff terms, rather than confirming that the tariff does not eliminate the obligation to comply with the many laws whose application does not run afoul of the filed-rate doctrine. Moreover, this clause is not some unique feature of this particular tariff. Its usage has dated back at least to the 1950s and has been referenced in several FERC rulings. See, e.g., Tenn. Gas Pipeline Co., 60 FERC ¶ 61,261 (1992); United Gas Pipe Line Co., 47 FERC ¶ 61,285 (1989); San Diego Gas & Elec. Co., 42 FERC ¶ 63,011 (1988); Columbia Gas Transmission Corp., 25 FERC ¶ 61,460 (1983). See generally Pan Am. Petroleum Corp. v. Cities Serv. Gas Co., 182 F. Supp. 439, 441 (D. Kan. 1958). We find it unlikely that FERC has been inadvertently invalidating through a backdoor its own

exclusive power to enforce the NGA's and Code of Federal Regulations' prohibitions or the terms of its approved tariffs.[4]

**D.**

PNE finally suggests that we revisit our conclusion in Breiding that the filed-rate doctrine applies to the defendants' capacity-reserving decisions, see 939 F.3d at 55-56, in light of the fact that FERC does not affirmatively approve those precise decisions, see id. at 50. PNE relies for this argument on Keogh v. Chicago & Northwestern Railway Co., 260 U.S. 156 (1922), and Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571 (1981), and this suggestion is cogently set forth in detail in the amicus brief filed by the Open Markets Institute. In a nutshell, this argument points out that, by defaulting to the market-based rates in lieu of cost-of-service rate-making, FERC has eliminated a justification for the filed-rate doctrine and increased the importance of ensuring that the pertinent markets are functioning properly. See generally Alfred E. Kahn, Deregulatory Schizophrenia, 75 Calif. L. Rev. 1059 (1987). And as California's experience in its 2000 and 2001 energy crisis demonstrated, there

---

[4] As we noted in Breiding, FERC did conduct an investigation and determined that the no-notice contracts had not been anticompetitively abused. See 939 F.3d at 55 (citing News Release: FERC Staff Inquiry Finds No Withholding of Pipeline Capacity in New England Markets, Fed. Energy Regulatory Comm'n (Feb. 27, 2018), https://www.ca1.uscourts.gov/sites/ca1/files/citations/18-1995_ BreidingvEversourceCitedURL.pdf).

is substantial evidence that FERC has been slow to recognize market defects that create opportunities to exploit market power. <u>See, e.g.</u>, <u>Morgan Stanley Capital Grp. Inc.</u> v. <u>Pub. Util. Dist. No. 1 of Snohomish Cnty.</u>, 554 U.S. 527, 553-55 (2008) (remanding to FERC, which had conducted only a summary analysis, for a more searching review as to whether alleged market manipulation had undermined the market factors that justify the use of the <u>Mobile-Sierra</u> presumption and might have led to supracompetitive prices). In this instance, too, FERC's brief and conclusory statement regarding its own investigation of the charges in this suit, <u>see</u> <u>supra</u> note 4, leaves one less-than-assured that FERC has been rigorous and thorough in filling the arguable enforcement gap created by the filed-rate doctrine.

At base, though, a market-based rate or tariff term allowed by FERC under its rate-setting authority is still a rate approved by FERC, albeit with a rate-setting measure (the market) other than cost-of-service to achieve the requisite assurance that the rate is just and reasonable. <u>See</u> <u>E. & J. Gallo Winery</u> v. <u>EnCana Corp.</u>, 503 F.3d 1027, 1035-43 (9th Cir. 2007) (discussing the transition from cost-of-service rate-making to market-based rates in the natural gas market and finding the doctrine applicable to market-based rates because the same underlying rationale of deference and preemption applies to both rate-setting mechanisms). So at the core of its argument, PNE contends that FERC's use of

this alternative tool for disciplining the behavior of FERC-regulated entities renders these entities essentially not FERC-regulated, such that rates deemed just and reasonable by FERC may nevertheless be punished as unreasonable in private civil damage actions. Given that Congress allowed the use of market-based rates without eliminating the filed-rate doctrine, see 15 U.S.C. § 717c(a), (c) (instructing FERC to declare only "just and reasonable" rates lawful); Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos., 498 U.S. 211, 224 (1991) ("[T]he just and reasonable standard does not compel the Commission to use any single pricing formula in general or vintaging in particular."), and given that Congress in the wake of the California energy crisis enacted remedial legislation that also contained no such provision limiting the doctrine's applicability or, as in the FCA, allowing enforcement in federal district courts, see Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594, we see no license to embark on such a substantial change of course from that marked out by precedent. None of this is to say that FERC has necessarily been diligent in ensuring that the markets it allows to set rates are themselves always properly functioning, a prerequisite for the assumption that the rates produced are just and reasonable. See Mont. Consumer Counsel v. FERC, 659 F.3d 910, 919 (9th Cir. 2011) (citing La. Energy & Power Auth. v. FERC, 141 F.3d 364, 365 (D.C. Cir. 1998)) (noting that "it is not unreasonable for FERC to

presume that rates will be just and reasonable" where "sellers do not have market power or the ability to manipulate the market (alone or in conjunction with others)").  Rather, it is to say that complaints to this effect need be raised with FERC and Congress, not with a jury, at least as we understand the law to now be.

## III.

For the foregoing reasons, we <u>affirm</u> the decision of the district court dismissing the complaint for failure to state a claim.[5]

_____

[5] "[T]he filed-rate doctrine applies with equal force to state-law challenges." <u>Breiding</u>, 939 F.3d at 56.  PNE raises no argument to the contrary.